PUBLIC SERVICE CORPORATION OF NEW JERSEY and THE GAS
AND ELECTRIC COMPANY OF BERGEN COUNTY

*v.*

JOHN W. DE GROTE et al.

VILLAGE OF RIDGEFIELD PARK

*v.*

PUBLIC SERVICE CORPORATION OF NEW JERSEY et al.

[Argued September 6th, 1905.   Decided October 19th, 1905.]

1. A corporation having the right under the act incorporating it to lay gas mains and conduct a lighting business in a certain township is not deprived thereof by a later statute dividing the township into three new townships.

2. A village ordinance requiring the consent of the street commissioner before gas pipes could be laid in the streets is repealed by a subsequent ordinance, giving a corporation such right and containing many conditions and restrictions, but not requiring such consent.

3. The act of 1903, permitting any corporation authorized to lay or maintain pipes in the streets of any municipality for the distribution of gas therein to use its pipes and mains for the transmission of gas to any other municipality in the streets of which it has a right to maintain pipes, is constitutional, and authorizes the laying of mains large enough for the purpose, though larger than required by the needs of the municipality in which they are laid.

4. Where certain township officers were enjoined in their individual capacities from interfering with the laying of gas pipes by complainant, and subsequently certain constables attempted to arrest those laying the pipes, and copies of the injunction were thrust upon the constables when they were making the arrests, and they took the papers and put them in their pockets without reading them, they would not be held guilty of contempt of court, it appearing that they acted in good faith.

On three applications:   (1) to modify an injunction, (2) to grant an injunction, and (3) to punish for contempt.

*Mr. Hobart Tuttle* and *Mr. Frank Bergen,* for the Public Service Corporation and the Gas and Electric Company of Bergen County.

*Mr. Luther Campbell* and *Mr. Michael Dunn,* for the village of Ridgefield Park and John W. De Grote et al.

STEVENSON, V. C. (orally).

I take up the matter of laying the pipes, or the attempt to lay pipes, in the village of Ridgefield Park. There are three separate motions now before this court to be determined. The first is a motion to modify a writ of injunction issued from this court by order of the chancellor, upon a bill filed by the Public Service Corporation of New Jersey and the Gas and Electric Company of Bergen County as complainants, against certain persons—six, I think—who were charged with interfering with the operation of the complainants in laying large gas mains within the limits of the municipality or village of Ridgefield Park. The injunction issued by the chancellor restrains these six natural persons from interfering with the deposit of these pipes along the streets in the village of Ridgefield Park, and the burying of them. The defendants the six natural persons embrace, as I recall the facts, three constables or police officers, or officers of that character connected with the municipality, a justice of the peace and two members of the board of trustees of the village. These six persons had, in an official way, interfered with the encumbering of the streets with these pipes. The two members of the public board had, to a certain extent, instigated the acts that were complained of, which consisted of the arrest of the agents of the complainants who were laying these pipes by the three police officers, and the arraignment and holding to bail of these agents before the defendant, who was a justice of the peace of the county. The defendants, having filed their answer, have not moved for a dissolution of the injunction, but have moved for a modification of it, which is equivalent to an injunction upon the complainants restraining them from

laying these pipes pending the litigation to ascertain and determine the respective rights of the parties. The complainants thus have enjoined the defendants from interfering with their operations in laying these pipes. The defendants, upon filing their answer, practically move for an injunction in the cause restraining the complainants from laying their pipes—a somewhat peculiar legal situation.

The next proceeding before this court in relation to this matter is an application on the part of the complainants the Public Service Corporation and the Gas and Electric Company of Bergen County to punish three persons for contempt because of their alleged conduct in the way of obstructing the complainants in the enjoyment of their injunction. That perhaps is not an accurate statement of the exact nature of this proceeding, as will appear further on, although perhaps it is the way in which the proceeding was conceived of by the originators of the movement to have these parties punished for contempt. The three parties are not defendants in the cause. The writ of injunction did not go against them either personally or by the use of any words which would include them within a class of people whom it was intended to reach and restrain. The application is made to punish these three outsiders because they did, or undertook to do, the very acts which interfered with the complainants' operations in laying these pipes, which the defendants in the suit had done, or undertaken to do, and which the defendants in the suit were enjoined from doing. It is an unusual contempt proceeding in the State of New Jersey, and, so far as I know, without precedent.

The third proceeding before the court is upon an original bill filed by the village of Ridgefield Park, which for the first time by this bill comes into these contentions, and the object of the bill is to restrain the Public Service Corporation and the Gas and Electric Company of Bergen County, the complainants in the former bill, from laying certain pipes, which are described in the bill, within the corporate limits of the village.

The answer of the six defendants to the bill of the Public Service Corporation and the Gas and Electric Company of Ber-

gen County takes two positions by way of defence : *First.* That the complainants have no right whatever to lay gas pipes in and under the streets of the village of Ridgefield Park without the written consent of the officials of the village, which consent is prescribed as a condition precedent to the opening of any street in the village by an ordinance adopted in 1893.

*Secondly.* That such right, namely, the right of the complainants to lay gas pipes in the streets of the village without obtaining the consent of the municipal authorities in writing, is confined to the laying and maintaining of pipes and mains which are reasonably necessary for the supply of gas within the corporate limits of this village, a small village of two thousand eight hundred inhabitants, and the answer sets up that as a matter of fact the complainants are not undertaking to lay pipes for the purpose which I have described, but are undertaking to lay immense iron pipes, of a diameter of twenty inches, for the purpose of transmitting gas through and under the streets of the village for use in other municipalities, where the complainants are engaged in purveying gas. The position is taken by the answer that this is an additional burden upon the streets; that the complainants have no franchise which permits them to lay or maintain such large pipes, altogether beyond the necessities of the gas-supply to the municipality.

The bill filed by the village of Ridgefield Park—and it must be borne in mind that the two defences which I have described are set up by the six natural persons who are defendants to the suit of the Public Service Corporation and the Gas and Electric Company of Bergen County—sets up the rights, of course, of the municipality, but the municipality is not a party to that first suit. The municipality, the village of Ridgefield Park, in its bill does not seem to take the extreme position which the six natural persons, the defendants, take against the former bill by way of defence. The village of Ridgefield Park asks for an injunction against the Public Service Corporation and the Gas and Electric Company of Bergen County to restrain them from laying these large twenty-inch pipes because they are not being laid for the purpose of carrying on any corporate business, for

accomplishing any of the corporate business of the two companies within the limits of the village, but are being laid for the purpose which I described a moment ago, and because the defendants are thus endeavoring to impose an excessive and unlawful burden upon the streets of the municipality, and are without the protection of their franchises, an injunction is asked.

Now, these are the three matters to be determined. They were all argued together. All the affidavits which belong to each proceeding are by consent to be used in the other proceedings. I think at last we have definitely settled what are the motion papers—what are the proofs which are to be considered in determining each one of these motions—and I may say here, I understand that the act of 1861 incorporating the Hackensack Gas Light Company and the act of 1864 incorporating the Bergen County Gas Light Company are also deemed before the court in evidence.

The first question to be determined in both of these suits is the question whether the complainants, or either of them, now have, or had at the time of the transactions which were the subject-matter of investigation, a right to lay and maintain gas mains within the corporate limits of the village of Ridgefield Park without obtaining the consent in writing of the official of the municipality designated by the ordinance of 1893 as the official whose written consent must be obtained. As I stated, the six defendants to the bill of the two corporations boldly take the position that the complainants have no right to open the streets and lay gas pipes without obtaining, in each instance, the written consent of this designated official, the superintendent of streets. This contention seems to me to be entirely without merit. The right of the complainants, or one of them, to lay and maintain a gas plant, a plant with gas mains and pipes under the streets of the village of Ridgefield Park, can safely be traced, in my judgment, to two different sources, and possibly a third. It is conceded that the complainant, the Gas and Electric Company of Bergen County, now holds and exercises all the franchises of the Hackensack Gas Light Company, incorporated in 1861, and the Bergen County Gas Light Company, incorpo-

rated in 1864, both being incorporated by special charters, which are before the court in evidence in these proceedings.

The charter of the Hackensack Gas Light Company, passed in 1861, incorporates the company, I now quote, "for the purpose of lighting the streets, buildings, manufactories and other places in and adjacent to the village of Hackensack, in the county of Bergen." It will be observed that the object is not "the lighting of streets, buildings and manufactories in Hackensack and *in other places adjacent.*" The object is "the lighting of the streets, buildings, manufactories and other places in and adjacent to the village of Hackensack," a somewhat different form of language from that employed in the case of the charter of the Morristown Gas Light Company, which was the subject of examination and determination in the case of *Madison* v. *Morristown Gaslight Co., 63 N. J. Eq. (18 Dick.) 120,* in the court of chancery, and afterwards in the court of appeals, as reported in *65 N. J. Eq. (20 Dick.) 356.* The charter of the Hackensack Gas Light Company further proceeds to empower the company—I now quote—"to lay down gas pipes and erect gas posts, burners and reflectors, in the streets, alleys, lanes, squares, highways and public grounds in the village of Hackensack and places adjacent in the county of Bergen." Here we have a most significant difference of phraseology from that which was employed in the Morristown case. A grant is made of power to lay down gas pipes in the streets, alleys, highways and public grounds in the village of Hackensack and in places adjacent in the county of Bergen. I have supplied the word "in," but grammatically it must be supplied, so that the gas company have the power here to lay pipes "in streets in places adjacent to the village of Hackensack, in the county of Bergen." I may not refer again to the topographical relations of these different municipalities, but the force of this language is apparent when we consider that it is now proved in these causes that the territory of the village of Ridgefield Park is adjacent to the territory of the old village of Hackensack, separated by the Hackensack river. I do not lose sight of the fact that a navigable stream separates these two places, and some

questions might arise in regard to the operation of the language which I have read. As I indicated, I do not trace any right of the complainants to the charter, not for the reason which Mr. Dunn has suggested, but for another, which I will briefly state.

The Hackensack Gas Light Company, after consolidating with the Hackensack Edison Light Company, became merged in the consolidated corporation called the Hackensack Gas and Electric Company, and this Hackensack Gas and Electric Company, being in possession of the franchise, which I have described, of maintaining gas pipes under the charter of 1861, whatever its scope may have been, saw fit to apply to the village of Ridgefield Park in 1898 for permission to lay their pipes in the streets, and obtained from that village and accepted an ordinance granting it the right to maintain a plant of gas mains in the streets of the village under a number of conditions which are set forth. The parties entered into a contract for the maintenance of this plant, by which each party received large advantages, and I think it is a very serious question indeed whether the corporation, the Hackensack Gas and Electric Company, having thus dealt with the village of Ridgefield Park and obtained this ordinance commonly but erroneously called a charter, and having enjoyed the fruits of it, and having laid their system of pipes under its provisions, now can come forward and say, "Oh, we had the right all the time to do this very thing under the old charter of 1861, by which one of our constituent companies, the Hackensack Gas Light Company, on account of the wide language employed in describing the area of its operations, got a right and had a right to do this very thing." For the reasons that I have indicated I therefore do not place the right of the complainants, or either of them, to lay and maintain gas pipes in the village of Ridgefield Park upon this charter of 1861, and originally, I may say, counsel for the two corporations did not insist that such a right could be maintained. Subsequently, however, counsel undertook to place the right of the complainants upon this charter of 1861, and therefore I have felt it necessary to dispose of the matter.

The next source of authority to these two corporations, or one

of them, to maintain a plant of gas pipes and mains in the village of Ridgefield Park is the charter of the Bergen County Gas Light Company of 1864. It is conceded that the complainants, or one of them, now enjoy all the rights which the Bergen County Gas Light Company received under its charter. It is necessary, therefore, to find out what rights to lay and maintain gas pipes were vested in the Bergen County Gas Light Company by this act of 1864. The act incorporates the company—I now quote—"for the purpose of lighting the streets, buildings and other places in the township of Hackensack and its vicinity." It is perfectly plain that under that language the object of the provision is to furnish gas lighting throughout the township of Hackensack, and also in its vicinity. The language is "the lighting of streets, buildings and other places in the township of Hackensack and its vicinity," and here again we have to supply the word "in," so that the phraseology when the word is supplied will be "in the township of Hackensack and *in* its vicinity." Well, we need not concern ourselves here about the meaning of the word "vicinity"—the content of that word— because at the time this charter was passed, in 1864, the entire territory of the village of Ridgefield Park was embraced within the limits of the township of Hackensack. In 1871, ten years after this charter was granted, the legislature divided the township of Hackensack into three townships, and, as I understood it, the whole territory of the original township of Hackensack was cut up into three different townships, there being no portion left, there being no Hackensack township left after this act went into operation. So I understand the contention of counsel. The act is entitled "An act to divide the township of Hackensack into three townships," and my brief examination of the act itself seemed to indicate that beyond the title there was nothing to show that the whole of the territory of the township had been carved up into these three townships. For all that appears from the language of the act as I have hastily read it, there might have been left a portion of the ancient territory of Hackensack township which, after the act went into operation, would constitute a Hackensack township, but the title announces that the

whole township was subdivided, and such is admitted to be the fact. Now, then, counsel for the defendants take the position that the division of this original Hackensack township into three different townships had the effect to limit the extent of the grant to the Bergen County Gas Light Company in this charter of 1864. I think this contention is without support in authority or reason.

In 1864 the legislature granted to this corporation the right to engage in the business of lighting the streets and houses throughout the entire township of Hackensack as it then existed. The corporation was created upon the strength of that grant. The capital was subscribed and paid in for that purpose. It may be questioned whether the legislature would have the power subsequently, by dividing up the township, to limit the operations of a corporation created by this charter. If the legislature could do that, where could the line be drawn? The township of Hackensack might be left by legislative action composed of one-tenth of the original township or one-twentieth of the original population. The grant of the legislature, upon which the corporation has been created, and on the strength of which the capital had been subscribed and paid in, might become of no value whatever. But there is not any intention discoverable in this legislation of 1871 to affect the charter of 1864. The charter of 1864 gives a right to maintain and carry on the gas lighting business throughout the whole territory of the township of Hackensack as it then existed. That grant is not affected by subsequent legislation which cuts up the territory of Hackensack township, and the mere fact that the Bergen County Gas Light Company had not seen fit to extend its pipes throughout the whole area of Hackensack township is entirely an immaterial circumstance. The money was subscribed and the business entered into upon the strength of this charter, which gave the corporation the right to extend its mains and to extend its business from time to time throughout the entire area described in the charter, the area of Hackensack township. This right could not be interfered with. It is not to be presumed that the legislature intended to interfere with it. I will say further, there

is not anything in the act of 1871 upon which a plausible argument can be founded that the legislature intended to interfere with the scope of the grant, the franchise, conferred on this corporation by the act of 1864, on the strength of which all this capital was invested. Nothing has been said about abandonment of any portion of the franchise of the Bergen County Gas Light Company, and I do not understand that there are any circumstances in this case that would found an argument that there had been any partial abandonment. These companies are started for the supplying of gas facilities in a prescribed area. It may take generations to cover the whole of that area. They keep on enlarging their plant from generation to generation as the public want increases, and it would be a very singular position to take that this corporation, chartered in 1864 for the purpose eventually of covering the entire area of this great township with a network of gas mains and pipes when the public want would justify such expenditure, must, within twenty years or thirty years or forty years, or any other prescribed number of years, cover all the area which they intend to cover, and that after a period has elapsed the extension of their mains must cease, notwithstanding the fact that the expansion of the population continues and the public want grows greater and greater and wider and wider. I cannot adopt any such theory as that. It seems to me, therefore, that the complainants, or one of them, the Gas and Electric Company of Bergen County, certainly had, at the time of the operations complained of, and now have, all the original charter rights of the Bergen County Gas Light Company under this charter of 1864, and that under its charter this complainant company has the right to—and I now read from the charter—

"To lay down their gas pipes and to erect gas posts, burners and reflectors in the streets, avenues, highways and public grounds, alleys and lanes in the township of Hackensack and its vicinity, and to adopt all proper and necessary means to light all dwellings, stores and all other places situated therein with gas."

And under our settled rules of construction, that right extends over the entire area of the township of Hackensack as it existed in 1864.

Upon turning to the act of 1871 again I observe that it left no township of Hackensack in existence. It divided what was the territory of Hackensack township into three new townships, no one of which bore the name of Hackensack. It would, I think, upon the theory of the counsel for the village of Ridgefield Park, be quite difficult to define the area within which the Bergen County Gas Light Company had power to operate after the passage of this statute. Counsel would hardly venture to go so far as to insist that when Hackensack township ceased to exist this gas company was deprived of its franchise.

The second source to which the right of the complainants, or one of them, may be traced is the ordinance of the village of Ridgefield Park adopted in 1898. It is conceded, I believe, by both parties in these causes that, under the act of 1893, the village of Ridgefield Park has the power to pass ordinances giving power to lay and regulate or prohibit the laying of water or gas or sewer pipes in the streets of the village. It is proved that the village of Ridgefield Park acted under that grant of power in 1893, and passed an ordinance providing in brief—I shall not turn to it—that no gas pipe should be laid in or under the streets of the village without the written consent of the street commissioner, and the six defendants to the bill of the two corporations, as I stated, take the very bold position that the complainants have no right to lay any pipes without obtaining that written consent. But it appears that in 1898, five years after this ordinance of 1893 was passed, the village of Ridgefield Park, as I stated some time ago, passed an ordinance giving the Hackensack Gas and Electric Company the right to lay and maintain a plant of gas mains and pipes throughout the village under the streets. This ordinance prescribes, to a certain extent, the conditions under which the streets shall be opened and how they should be closed. It is filled with conditions and terms affecting the rights of the two parties and giving each of the parties great rights. It manifestly deals with and covers the whole business of opening the streets. It therefore, so far as the operations of the Hackensack Gas and Electric Company were concerned, totally repealed the provisions of the ordinance

of 1893. It is entirely inconsistent with its provisions. To my mind it is preposterous to argue that after this ordinance of 1898 had been passed and these great considerations given to the village, these mutual contractual relations entered into, the Hackensack Gas and Electric Company had not the power to open a street in the village, to lay a pipe, to replace a main, without first obtaining the written consent of the superintendent of streets, and perhaps depositing a sum of money, in pursuance of the terms of this ordinance of 1893. The two ordinances must be construed together, and the later, the ordinance of 1898, has full force so far as it is inconsistent with the provisions of the ordinance of 1893. My conclusion is that the right of the two complainants to maintain a plant of gas mains and pipes within and under the streets of the village of Ridgefield Park is clear, whether it be placed upon the charter of the Bergen County Gas Light Company of 1864 or the ordinance of the village passed in 1898.

I may say right here, lest I forget it later, that no question is raised in these litigations in regard to the power of the municipality to impose reasonable regulations upon the complainants with respect to the laying and maintaining of these gas pipes. The complainants submit to such reasonable regulations, if there are any which ought to be imposed in view of the fact that the ordinance of 1898 itself very carefully and fully seems to regulate the exercise of the powers which that ordinance granted to the Hackensack Gas and Electric Company.

The question which has been debated in this cause is not whether the complainants, or either of them, have an absolute right, free and untrammeled from all restrictions on the part of the village, to lay and maintain their gas plant, but whether the village has the absolute right to prohibit the complainants, or either of them, from excavating the streets until or unless a written permission is given in each case by the superintendent of streets of the village. No question of regulation is raised in this cause. It is not the power of the village to regulate which is insisted upon here—to reasonably regulate the exercise of rights and franchises of these companies. It is the power of the

village under this ordinance of 1893 to prohibit which is insisted upon. I find that no such power exists in this case, for the reasons that I have mentioned.

Now, the next question, far more difficult, is the question arising upon both these bills of complaint as to the extent of this franchise, this right of the complainants, or one of them, to lay and maintain a plant of gas pipes under the streets of this village. Conceding that the complainants, or one of them, have full power to maintain a plant of gas pipes in this village for the supply of the village, the question is, Have they now a wider right; can they lay and maintain pipes greatly in excess of what are reasonably necessary for the supply of gas for this municipality and the supply of gas to these streets and to the two thousand eight hundred people who live within its corporate limits, and can they lay down twenty-inch pipes, the main function of which is to transmit gas to other and perhaps distant municipalities where the complainants are engaged in purveying gas?

Counsel for the village and its officers cited the case of *Andreas* v. *Gas and Electric Company of Bergen County,* reported in *61 N. J. Eq.* (*16 Dick.*) *69,* where the court of chancery held that an electric light company was not authorized to erect and maintain poles and appurtenances thereon in the streets larger than were necessary for the public use. As I recall the case now, after this period of delay, it was conceded, or at any rate the court found, that the electric light company had the right to maintain poles and appurtenances attached thereto in the streets of the village which were reasonably necessary for lighting the public streets, but had no right to erect and maintain larger poles with more numerous arms attached thereto than were necessary for this public lighting, the real object being to enable the company to carry on its private business and supply private lights to private consumers. If I recall the conclusion of the case correctly, the case was held in order that the court might supervise the construction of the poles, or at any rate that proceedings might be taken to see that the electric light company was kept within the limits which I have indicated.

Well, I think we may concede that if the sole right of the complainants, or one of them, to maintain a plant of gas pipes in the village of Ridgefield Park must be based upon the charter of 1864 of the Bergen County Gas Light Company, or the ordinance of 1898 of the village, the contention of the village in these cases would have to be sustained. It seems to me that if a gas company has the right to maintain within a municipality a plant of gas pipes solely for the purpose of supplying the needs of that municipality, when it goes to work to lay enormous pipes in excess of what is necessary for the accomplishment of their corporate purpose and object within the municipality for the purpose of conveying gas to distant places, they are away beyond the limits of their franchise, and the remedy of the village is probably by injunction.

The complainants, manifestly perceiving the force of the objection on the part of the defendants to which I have referred, looked about to find some authority to sustain them in this apparently excessive use of the streets of the village, which the village seeks to enjoin. They cited the act of April 8th, 1903, entitled "An act relating to corporations of this state now or hereafter having lawful authority to lay or maintain pipes or mains in the streets or public places of any municipality for the distribution of gas." The complainants insist that under this statute, if a gas company—and ordinarily a gas company, to constitute an instance of the sort with which we have to deal, would have to be a consolidated company—if a gas company has the right to purvey gas in three or four or a dozen different municipalities, and to maintain in each a plant of gas pipes and mains for the supply of that particular municipality, then by virtue of this act of 1903 the gas company may not only transmit gas from one system to the other, but it may unify all these systems and make the pipes in each large enough not only to supply the lighting within the corporate limits of that particular municipality, but also large enough to transmit gas throughout the system. Thus, in case there are six or eight adjacent municipalities in which there are six or eight separate gas companies, each having a franchise under which it had the power to main-

tain a plant sufficient for the purpose of the lighting business within the corporate limits, if that was the situation, power is given under this act to a corporation formed by a consolidation of these separate companies to maintain pipes much larger than would be necessary in each municipality for the supply of that municipality—to maintain pipes in each municipality large enough to transmit gas to the other municipalities. Now, of course, it is perfectly plain in the case I have put, where you have six or eight adjacent municipalities with six or eight separate franchises of this character, all held by one corporation, that the result of the unification of the entire plant is that there would be central mains with great capacity, very much greater than could be necessary under any possible circumstances for the supply of gas in any one municipality by itself.

Counsel for the village of Ridgefield Park makes several objections to this statute—I think several constitutional objections. My recollection is that counsel insisted that the act is a special act, and also that the title is defective. I gave close heed to these arguments of counsel. I shall not undertake to recall them at this late date. I think they are without foundation. The statute is unassailable, it seems to me, from a constitutional point of view. There is a difficulty, however, about the statute which was not the subject of argument, but which has caused me some hesitation. I dislike disposing of the cause upon points that are not raised in argument. This cause was argued with great care, after industrious preparation, and with great ability on both sides. Still I cannot avoid dealing with the question which appears directly upon the face of this act and is raised by the pleadings. The act provides that any corporation in this state now or hereafter having lawful authority to lay or maintain pipes or mains in the streets and public places of any municipality for the distribution of gas may *use* its pipes or mains within such municipality for the transmission of gas to any other municipality in the streets or public places of which it may also have lawful authority to lay or maintain pipes or mains for the distribution of gas; and then, out of abundant caution, the act provides: "Provided, that nothing herein con-

tained shall grant to any corporation a franchise to lay down gas pipes for the distribution of gas in any municipality in this state." The act, as I stated, deals with a situation where there are two separate franchises for the supply of gas in two separate municipalities, each franchise carrying with it the right to maintain a plant adequate for the purpose. And the act provides that any corporation in the possession of two such franchises may use its pipes or mains within the corporate limits of each municipality for the transmission of gas to the system maintained in the other municipality. Now, the question is whether that gives a right to the corporation to maintain larger pipes in each municipality than those which are required for the supply of gas in that municipality. Does this additional use permitted by the statute carry with it the right to maintain larger pipes than those which are measured by the requirements of the franchise in each municipality? The language of the act is obscure, badly chosen. It would have saved all question if the act had provided that in the situation with which it deals the corporation should have the right at all times to lay and maintain gas pipes, not only for the supply of gas within each municipality, but also for the transmission of gas to other municipalities. Practical reasons may be surmised why such plain language was not employed.

I made a very close examination of this act a week or ten days ago, and I am not sure that I can recall now all the points which finally led me to the conclusion that it was the intention of the legislature to enlarge the franchises of corporations having the power and charged with the public duty of supplying gas to a number, and perhaps a large number, of municipalities. It is a little difficult to see what the real scope and effect of this act would be if it has not the effect which I have mentioned. Here is a grant to a corporation in the situation of the complainants, or one of them, the situation of the Gas and Electric Company of Bergen County, to use its pipes or mains within the municipality of Ridgefield Park for the transmission of gas to these four or five other municipalities where the Gas and Electric Company of Bergen County has the power to maintain gas

mains.   The Gas and Electric Company of Bergen County is allowed to use its pipes in the village to transmit gas to these other places.   Well, now, if that does not confer the right to maintain a pipe or pipes in Ridgefield Park larger than are necessary for the municipal purpose of that city—large enough for an efficient transmission of gas to these other places, what operation has the act?   Certainly it is hard to say how the stockholders of the Gas and Electric Company of Bergen County could complain if that corporation saw fit to transmit gas through the Ridgefield Park pipes to the pipes in the other municipalities.   How could the stockholders complain?   How could the village complain?   The pipes are there.   They are lawfully there.   The entire public burden is upon the municipality and its streets.   The public burden is not enlarged when those pipes are used to transmit gas to the adjacent village.   It is rather difficult to see how there is any practical operation of this statute in protecting the gas company from objections on the part of the village of Ridgefield.   Last of all, I want to say —not last of all, but last of all according to my present recollection—there is a difficulty in perceiving why this act was necessary in order to save the Gas and Electric Company of Bergen County, or any other corporation similarly situated, from an attack by the attorney-general of the state.   I have not really thought this matter out.   It is a very fine point indeed.   Whether technically there would be any foundation without this enabling act for a complaint of the attorney-general that the Gas and Electric Company of Bergen County was misusing its franchises when it employed its pipes in Ridgefield Park, not only for the supply of gas within the corporate limits of the village, but for the transmission of gas to the adjacent village.   Whether there is any foundation for any complaint or not, I hardly deem it necessary to decide.   It seems to me that to confine the act to such a narrow effect as that would be unreasonable.   The legislature had some other object in view in passing this statute besides legalizing the use of the plant of the gas and electric company in Ridgefield Park, to take this instance, for the transmission of gas to the adjacent village in which the gas and elec-

tric company had full power to maintain gas pipes and to supply gas. Now, what was the intention of the legislature? I think we have a right to regard the history of the state, the history of its industries, the history of its corporations, in dealing with an act like this. It was passed in 1903, at a time when consolidations, especially of gas companies and lighting companies, had been made throughout the entire state. The old system of having separate gas companies, each one supplying a different village or a different town, had been, to a very large extent, displaced by these great consolidations, of which we have striking illustrations afforded by the history of gas lighting and electric lighting in Bergen county set forth in these bills of complaint and these answers. The legislature recognized the fact that, instead of six separate gas companies, each with a gas plant, including a gas manufactory and gasholder for each village, a new system had come in and the six now are consolidated, and instead of six systems of smaller pipes, of comparatively small pipes, each supplied from a separate source, the situation was created in which, in order to gain the great economies of consolidation and give the public the benefit of these economies, it was necessary to unify the six plants and lay them out as one whole plant with large central mains and then smaller mains, thus making a united system out of what was formerly six separate systems. I think the legislature recognized the fact as it existed before the legislature and before the state at the time this statute was passed, and the legislature said, "We have this situation existing; we now will enlarge the power, the extent, of each franchise and enable the single corporation holding the franchise to use pipes in each locality, in each municipality, not only for the purpose of supplying gas there, but also for the purpose of transmitting gas to the next and to the third and to the fourth and to the fifth and to the sixth municipality." It seems to me that was the intention of the legislature, however inaptly expressed that intention may be in the language of this act. If that result is not correct, what would be the situation? Did the legislature mean to leave the consolidated corporation exercising the power and charged with the duty of supplying the

gas to six municipalities within the power of each one of these municipalities? Can each municipality exercise the arbitrary power of saying, "You shall not lay down a pipe within our limits larger than is necessary for the supply of gas within our limits? We intend to block and stop and thwart the effects and benefits of consolidation." Is it not plain that where you have the interests of five or six adjacent municipalities involved it is not wise, it is not politic, that each one of these municipalities should wield any such power? It seems to me, therefore, that the legislature intended to deal with a matter which was naturally beyond the scope of the authority and power of each municipality. It may be questioned whether the village of Ridgefield Park has any power whatever to grant a corporation the right to run a gas main twenty or forty inches in diameter through its public streets for the purpose, not of supplying that municipality, but for the purpose of supplying other places with gas. Is there any such power resident in each municipality? The legislature, however, came in and dealt with the situation, which was manifestly beyond the natural scope of the powers conferred upon each municipality. It being a matter of wide public concern, the legislature took hold of it and laid down a rule, and the rule is as I have stated. When you have six separate franchises, each one measured by the requirements of a different municipality, six in all, but you have one corporation possessed of all these franchises and charged with all the duties under each, then the legislature said, "There has been a physical consolidation, now we will permit you to practically consolidate your franchises, so far as the maintenance of the plant is concerned; to lay large enough pipes anywhere throughout the entire area, not only for the supply of gas within a particular municipality in which such large pipes are laid, but large enough to supply the whole system, large enough to enable the consolidated company to erect and maintain a single manufactory of gas, and thus accomplish the enormous economy which always is accomplished when six separate gas manufactories are suspended and substituted by a single one." Of course, the consumer gets a share of the benefit of this economy.

An argument can be made, which I think would require consideration, that the Consolidation act, when applied to gas companies occupying distinct but adjacent territories, confers the power upon the consolidated company to unify the system of gas mains and transmit gas throughout the whole system from a single central station without invoking any aid from this somewhat peculiar act of 1903. If six railroads connecting with each other are consolidated so as to form a single line, the result may be to compel or induce the consolidated corporation, for the successful operation of its consolidated line, to do many acts, to maintain many expensive structures and employ many instruments for the operation of the railroad, none of which would be germane to the purposes of the original constituent corporations or constituent railroads. Six separate adjacent gas companies, when consolidated under the statute, cease to be an aggregation of distinct units; they are consolidated into a single gas company. There is force, I think, in the argument that the legislative scheme of consolidation, in the case of railroads, in line or gas companies occupying adjacent territories, necessarily implies a unification of the properties and plants of the several corporations corresponding exactly with the legal unification of the corporations themselves. I shall not, however, develop this argument, or attempt to ascertain its exact force, because we have not to deal with the legal effect of the Consolidation act alone. It is the Consolidation act, together with this act of 1903, with which we have to deal. Whatever may be the force of either of these acts when taken alone, in my judgment, their combined force legalizes, in a case like this, the substitution of several separate systems of gas mains by a single system, supplied from a single source, and therefore naturally, if not necessarily, composed, in part at least, of very much larger gas pipes than would be authorized by any one of the constituent franchises.

For these reasons, which I have endeavored to indicate, I reach the general conclusion that the complainant corporations, or one of them, have the power not only to maintain a plant of gas mains and pipes in the streets of the village of Ridgefield Park,

but that they have a right to lay and maintain pipes therein large enough for the transmission of gas to the other municipalities in which they, the complainants, or one of them, have the power and are charged with the duty of purveying gas.

I may say here that last night I looked through these papers with some care in order to discover whether it appeared that the complainants, the two corporations, are in fact endeavoring to lay a pipe, this pipe twenty inches in diameter, for the purpose of supplying gas to localities beyond the scope of the operations authorized by the act of 1864, the charter of the Bergen County Gas Light Company. There is no doubt, from the evidence, that the pipes which the two corporations are threatening to lay are larger than are necessary for supplying the village of Ridgefield Park and its two thousand eight hundred inhabitants with gas. There is no question about that whatever, but I fail to find any sufficient evidence that the other municipalities for the benefit of which these large pipes are being laid lie beyond the limits of Hackensack township. The affidavit of Mr. Wheaton made some statement, but it is mere hearsay. Well, I do not intend to decide the matter. I suppose the burden is upon the village authorities to show that there is an intention on the part of the two complainants to use this situation for an unlawful purpose There is this fragment of testimony, if it may be called testimony, that one of the officers of the company said something. I gravely doubt whether, taking these papers as a whole, if I should re-examine them, I could find that the complainants, the village authorities, have shown that these pipes are larger than are reasonably necessary for the purpose "of lighting the streets, buildings and other places in the township of Hackensack and its vicinity." I pass this point, however, because my conclusion which I have announced on the main question is sufficient for the disposition of these causes.

One more point, however, remains to be noted. Counsel for the village of Ridgefield Park and these six natural persons, defendants to the first bill that was filed, take the point that the public service corporation is a corporation created under the General Corporation act, and that it appears in this case, and is

alleged on both sides and is admitted, that in March, 1905, the Gas and Electric Company of Bergen County executed a lease of all its property and all its franchises, except its franchise to be a corporation, to this corporation, the Public Service Corporation, which existed under the General Corporation act, 'and that the Public Service Corporation has no power to exercise the functions of a gas company. I do not have to decide a number of questions which are thus raised, because the lease which I have mentioned has been put in evidence, and the lessor corporation, the Gas and Electric Company of Bergen County, is a co-complainant in the cause. An examination of that lease shows that the Gas and Electric Company of Bergen County has a very important and direct interest in the operations which are the subject-matter of litigation in these causes. If there is any defect in this lease, the sooner the Gas and Electric Company of Bergen County find it out the better. If the lease is void, the sooner they resume possession of their property the better. Meanwhile the development of their property must go on. Business must be done for the maintenance of the great plant and business which the Gas and Electric Company of Bergen County undertook in good faith to lease. The Gas and Electric Company of Bergen County being a co-complainant, an injunction would go, in my judgment, most properly in this cause for the preservation of the rights of that corporation, just as if no lease had been attempted. Of course, it is quite a question whether the Public Service Corporation can take a gas plant and gas franchises by lease and then use and exercise them. It is settled that a corporation under the General Corporation act cannot exercise the functions of a gas company, even by leave of the municipal authorities. That is settled in the case of *Richards* v. *Dover, 61 N. J. Law (32 Vr.) 400.* Counsel for the complainants, the two corporations, points out a statute of the state which he claims validates this lease. This statute is entitled "An act concerning corporations," and was approved March 24th, 1899. *P. L. 1899 p. 334.* It provides that

"any corporation of this state, except railroad and canal corporations, may hereafter, with the assent of two-thirds in interest of its stock-

holders, either in person or by proxy, lease its property and franchises to any corporation, and every corporation of this state is hereby authorized to take the lease or any assignment thereof for such terms and upon such conditions as may be agreed upon, and that any such lease or assignment, or both, heretofore made, are hereby validated."

There is a proviso, which I need not read. It seems to be conceded that the lease in this case from the Gas and Electric Company of Bergen County to the Public Service Corporation received the required assent of two-thirds in interest of its stockholders. No objection to the validity of the lease is made on the ground that such assent was not given. Counsel for the village of Ridgefield Park made some objections to this statute similar, I think, to those that he made and urged with regard to the act of 1903 authorizing the use of pipes in one municipality for the transmission of gas to another municipality, that it is a special act and that the title is inadequate. Well, I have not examined those objections, but my impression is that they are unfounded. The difficulty about the act, as it seems to me, or the question in regard to the act, is whether—when the legislature has provided, and in fact maintains on the statute-book, a special statute relating to the incorporation of gas companies, imposing special limitations upon them and providing for them a special form of government, through a very large number of directors, much larger than is required for the government of a corporation created under the General Corporation act—this statute of 1899 is to be construed to enable a corporation created under the General Corporation act, perhaps with three directors only, to accept by lease the franchises of a gas corporation and then exercise these franchises and carry on the gas business. I am very glad that I do not have to consider or decide this question. I avoid it, as I feel it is my duty to do, because the decision of it is unnecessary, in my judgment. We have here a complainant, as I stated, the Gas and Electric Company of Bergen County, with the unquestioned power to exercise all the franchises conferred by the charter of 1861 upon the Hackensack Gas Light Company and the charter of 1864 upon the Bergen County Gas Light Company and the ordinance of the village of Ridgefield Park, adopted in 1898, granting a gas

franchise to the Hackensack Gas and Electric Company. Inasmuch as this co-complainant has had all these powers, and has them to-day if it has not by a valid lease transferred them to the Public Service Corporation, we have, I think, an actor, a complainant in court, whatever views may be taken of the scope and effect of this statute of 1899, entitled to the protection of the court through the instrumentality of an injunction.

The result is, *first,* in regard to the motion to enjoin the Public Service Corporation and the Gas and Electric Company of Bergen County from laying its pipes pending this litigation,. that the motion must be denied.

And *second,* in regard to the motion on behalf of the village of Ridgefield Park, upon their bill and the answer of the two complainant corporations for an injunction restraining the two corporations from laying mains larger than are necessary for the supply of gas to the village of Ridgefield Park and its two thousand eight hundred inhabitants, that the motion also must be denied.

Now, in regard to the costs, I note that the bill originally filed by the two corporations upon which the chancellor granted an injunction did not set forth, as it was not obliged to do, that the two complainant corporations had applied to the village authorities of Ridgefield Park for a permission, apparently under the provisions of the ordinance of 1893, to lay the very pipes which they undertook to lay without getting that permission. While that application was pending, these corporations, having thus most unmistakably represented to the village authorities that their consent was necessary, went on, without their consent, to lay these pipes, acting upon the authority of their charter and the ordinance of 1898, which apparently they had conceded was not adequate to sustain them in laying these pipes. Ordinarily a man does not crave permission to do a thing which he has a right to do. If the village had submitted to this injunction, it would have been a question whether any costs would be allowed against them in the suit, but the village did not submit. The village employed counsel and then proceeded to examine all these charters and ordinances, and these counsel advised the

village, and also these defendants, that the corporations had no right to open the streets without the written consent of the commissioner of streets under the ordinance of 1893, and also advised further that the corporations had no right to lay larger pipes than were necessary to supply gas to the village. Well, they have brought these matters here into court by their answer to the bill of the two corporations and by the bill of the village, and whatever may be the result elsewhere, in this court they have met with defeat. The finding of the court is against them, and therefore it seems to me that the Public Service Corporation and the Gas and Electric Company of Bergen County, complainants in one cause and defendants in the other, are entitled to costs on both motions.

The third matter for determination is the proceeding against three individuals who are strangers to the two suits with which we have dealt, to have them punished for contempt. I have not had an opportunity to examine the evidence since the day when I expected to deal with it at length. I shall not undertake now to more than indicate, in an imperfect way, the reasons which have brought me to the conclusion that the three persons, Anton Dosch, Thomas Malley and J. F. Belkorf, are not guilty of contempt of court in the conduct of which complaint has been made, and have therefore not made themselves amenable to punishment. The proceeding, as I think I stated at the start, is almost, and probably absolutely, without precedent in the State of New Jersey. We have an injunction here issued against six persons, their officers, agents and servants. As a matter of fact, these six persons were all acting, in doing the things complained of, in an official capacity, but the injunction does not refer to the capacity in which the defendants acted at all. The injunction goes to the six persons and their agents and enjoins them from interfering with the laying of these pipes. Where the effort is made by a writ of injunction to restrain an indefinite class of persons who are liable—any one of whom or any number of whom are liable—to be excited to do the things complained of, it has got to be the custom, especially in the western federal courts, to let the injunction go to certain persons named and

then to a class of persons who are described. Sometimes they are described as members of a labor union, or employes of a railroad, or even residents of a city. Well, a great many questions may yet be debated as to the exact legal effect and operation of such injunctions. It is a novel way of bringing in parties to a suit. Whether such description has any other operation and effect than a notice of the injunction may be questioned. I know of no injunction of that character issued out of this court, although possibly in one or two instances such an injunction may have been issued. But in this case no language is inserted in the writ attempting to enlarge the scope of the injunction. Its restraining force is upon citizens of Ridgefield Park, gentlemen who are officers of that township. In terms the writ is confined to these six individuals, and restrains them from interfering with the laying of these pipes, and manifestly on its face relates to the personal conduct of these six individuals. Now, it is complained in these proceedings that these three men, knowing of this injunction, went forward as officers of the township and made the same sort of arrests for laying pipes that were the subject-matter of complaint in the bill, and to restrain which the injunction had gone against the six natural persons who are defendants. The question is whether such conduct on their part amounts to a contempt of the process and power of this court. I do not question that the court of chancery has power to punish any person for contempt who by his conduct undertakes willfully to thwart the power of the court or to interfere with and obstruct the service of its process. Where such process is a writ of injunction, and the party who does the act complained of is not a party to the suit, he is not punishable for contempt for a violation of the injunction. That is perfectly well settled. He is not enjoined, and he does not violate any injunction. If he is guilty of contempt at all, it is probably a criminal offence, and indictable, an obstruction of public justice, and such contempts are not only punishable by indictment, but they are punishable by the power of this court. If such were not the case, oftentimes the process of this court could be defied, its remedial agencies rendered inoperative by the voluntary unlawful act of indi-

viduals who assume to step in and prevent the accomplishment of objects which the court has said shall be accomplished in a suit between parties. The rules of law governing this sort of contempt and the power of the court to punish it are perhaps more fully set forth and discussed than in any other case in the recent English case of *Seaward* v. *Paterson, 1 Ch. 545 (1897).* In that case, however, the party who was punished was found guilty of aiding and abetting the defendant, who was found guilty of violating the injunction of the court. That is a most important circumstance which does not exist in this case. The English court sustained its power to punish this outsider for taking part in conduct that was violative of its injunction, and it distinctly points out that it did not punish the man for violating the injunction, because no injunction was imposed upon him. They punished him because his conduct tended to obstruct the administration of justice, to thwart the court in its effort to administer justice; but the fact remained that the party thus punished was aiding and abetting a defendant who was found guilty of violating the injunction. In other words, there was in that case a violation of the injunction of the court by a defendant punishable as such, and this outsider's conduct was in the way of aiding and abetting that violation. It will be observed that in the case before this court there is no violation of the injunction. No defendant, no person, charged by this writ with the duty of obeying its mandate has violated the injunction. Three outsiders have come in as volunteers, have done acts which are precisely the same as those acts which were enjoined in the suit. That is all. Well, I do not say, notwithstanding the absence in this case of any violation of the injunction, that persons pursuing conduct such as these three defendants pursued may not be punishable. I do not have to decide this novel point, and I feel it is my duty to refrain from doing so, because we may concede that the court has such power, and that such power is necessary in order to the administration of justice, in order to the accomplishment of those great beneficial objects secured by the preventive remedy of injunction. There is great force in the position that if the complainants in this case obtained an

injunction against three police officers of Ridgefield Park, after the full force and effect of the injunction had been advertised and widely known, and the village and its legal advisers had had opportunity to look into the matter, three other police officers would be guilty of contempt if they volunteered to do the very things which they knew had been enjoined, and which they had every reason to expect the court would enjoin them from doing. There is great force in the argument that if a second injunction should be got out against the new set of officers that three others, who the next day should undertake to pursue the same line of conduct, would be liable to proceedings for contempt. If that were not so in the very class of cases to which this belongs, the whole remedial power of the court of chancery could be absolutely thwarted by relays of offenders who would come in to do the acts which they knew right well had been enjoined in the case of their brethren, and knew right well would be enjoined again if opportunity afforded. But before any such power should be exercised by this court the case ought to be made plain beyond the shadow of a doubt. The court should proceed with the utmost caution in proceedings for contempt in this class of cases. Now, here we have three men, who appear to be reputable, law-abiding citizens, charged with the administration of law in their locality. They acted in this matter without any motive of personal gain, and that is a most important consideration in determining whether parties are guilty of contempt of the power of this court. They acted under a mistaken but honest intention to subserve the public interest, to protect the public right and the public property. They are not defendants, as I said, in the injunction, and I have noted that the injunction was only brought to their notice at the time when they began to do the things complained of, when they were making these arrests. It would be very harsh to say that these three men, these honest constables, who were not lawyers, were bound to take the copy of the injunction, which was thrust upon them in the heat and excitement of the making of these arrests, and read it and arrive at a correct idea of its legal effect and scope, and to discover that they would have to practically obey the injunction, although they

were not parties to the writ, and because they did not do these things they must be charged with the actual criminal intent to defy the power of the court of chancery. I am very sure that I cannot recall all the considerations which occurred to me as controlling this motion to have these men punished for contempt, but I think that I have indicated the leading reasons. My conclusion is that there was no intentional willful effort on the part of these defendants to thwart the power and process of the court of chancery. They acted rashly, but they acted in good faith. Of course, if men knowingly do anything the effect of which is unlawful, they are generally charged with intending to do what has naturally followed as the result of their conduct, but in punishing for contempt, I think, generally there must be an evil mind in order to find a criminal intent, and that is what I think is necessary in this case. There must be an actual intent to do wrong, an actual intent to thwart the power of the court. I do not find such an intent in this case, and therefore reach the result that the three defendants are not guilty. I think, in relation to this matter of contempt, there should be no order for costs. The defendants are found not guilty of actual intent to defy the power of the court, but they are not without blame. There is no question about that. They took the injunction papers and put them in their pockets. They refrained from reading them. A strong argument can be made that they are guilty of very rash and imprudent conduct, which warranted the proceedings which were taken to have them punished for contempt, and therefore I think I shall make no order for costs.